**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

     **Plaintiff,**

     v.

JUAN CARLOS REYNOSO [2],

     **Defendant.**

**CRIM. NO. 25-284 (RAM)**

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is the Government's *Motion for Detention Pending Trial* ("*Motion*"). (Docket No. 6). For the reasons set forth below, the Court **GRANTS** the Government's *Motion*.

### I.    BACKGROUND

On June 25, 2025, a federal *Indictment* was filed against Defendant Juan Carlos Reynoso ("Mr. Reynoso" or "Defendant") and another defendant, charging them with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). (Docket No. 3). The *Indictment* was issued due to Defendant's involvement in OmegaPro, a cryptocurrency investment scheme that allegedly raised over $650 million from thousands of investors between July 2019 and November 2022 before its collapse and subsequent loss of all investment funds. (Docket Nos. 3 and 6 at 4). An arrest warrant was issued the same day, and Mr. Reynoso

was arrested in the Southern District of Florida on July 1, 2025. (Docket Nos. 5 and 6).

On July 2, 2025, the Government filed the *Motion* requesting that Mr. Reynoso be detained pending trial because he poses a serious risk of flight. (Docket No. 6). Namely, the Government argues that his history of violating a court order, substantial time he spends abroad, and his access to sizable funds overseas would enable Mr. Reynoso to live overseas rather than remain in the United States and face his ongoing criminal case. Id. at 2. On July 3, 2025, the United States filed an *Emergency Motion to Stay Release* after a Magistrate Judge in the Southern District of Florida set conditions of release allowing Mr. Reynoso to travel to Puerto Rico on his own accord. (Docket No. 7). The Court granted the stay the same day. (Docket No. 8). A *de novo* detention hearing was held before this Court on July 23, 2025, with both Defendant and the Government appearing. (Docket No. 37).

## II.  FINDINGS OF FACT

The Bail Reform Act directs the judicial officer to include written findings of fact in a detention order. *See* 18 U.S.C. § 3142(i)(1). The below findings of fact are drawn only from the information, exhibits, and testimony presented at the *de novo* hearing conducted on July 23, 2025, as well as accompanying court documents. These findings of fact have been made solely for the purpose of deciding the pending *Motion*. *See* 18 U.S.C. § 3142(j).

**A. Proffer by the Government**

The Government proffered that Mr. Reynoso poses both a risk of flight and a danger to the community. In support of its arguments, the Government presented various exhibits, including the following:

1. A series of screenshots of Instagram posts by a company called Thrive99X. One post discusses a recent company event in June 2025 in Panama and was liked by an account associated with Mr. Reynoso. Another post includes a group photograph with a man who appears to be Mr. Reynoso.

2. A series of screenshots of Thrive99X's website, which advertises itself as "an escape plan to freedom" offering various educational opportunities and artificial intelligence section through a commission-based multilevel marketing business plan that offers daily pay-outs to participants. The front page of the website also claims that Thrive99X has been featured on CNN, the New York Times, BBC, Entrepreneur, USA Today, and Forbes; the Government asserts it has found no mention of Thrive99X on any of these websites. There is no contact information for Thrive99X.

3. A printout of a real estate website showing Mr. Reynoso's Miami property listed for sale and a composite of Google real estate listings that appear when the property's address is searched, including a listing that states "seller motivated."

4. A series of financial statements involving payments between ReyFer Digital ("ReyFer"), a company owned by Mr. Reynoso, and various third parties. The statements show that Mr. Reynoso sent money to third parties, then billed third parties through ReyFer, who later paid Mr. Reynoso that same amount. For example, a series of February 2025 transactions show: (i) ReyFer billing a Mexican construction company for $35,000; (ii) Mr. Reynoso sending the construction company $35,534; (iii) the construction company sending the money to Conduit Financial; (iv) Conduit Financial sending $35,000 to ReyFer; and (v) Mr. Reynoso billing ReyFer Digital, who then pays Mr. Reynoso that same amount.

First, Government argued Mr. Reynoso presents a financial danger to the community because Mr. Reynoso is engaging in similar activities as those that are the subject of the *Indictment*. Both Thrive99X and OmegaPro used affiliate-based marketing models, involved recruitment-based commissions, promised significant returns on investments, and had marketing materials in both English and Spanish. Given the similarities between Thrive99X and OmegaPro and Mr. Reynoso's apparent involvement in both companies, the Government asserts that Mr. Reynoso is willing and able to defraud others through his participation in Thrive99X. The Government also points to Mr. Reynoso's involvement in AirBit Club, a Ponzi scheme that promised investors returns on cryptocurrency investments;

Crypto World Evolution, "which allegedly used a trading bot linked to [a] cyptocurrency exchange that went out of business; IcomTech, a Ponzi scheme that promised profits from cryptocurrency trading and mining; and "a scheme called T-Minor." All of these schemes were active within the last decade, and Mr. Reynoso has acknowledged that both AirBit Club and IcomTech were Ponzi Schemes. The Government argues his pattern of involvement in these types of enterprises signals a willingness to continue similar behavior in the future, such as through Thrive99X. As Thrive99X is a web-based business, the Government believes that Mr. Reynoso can cause financial harm to others as long as he has access to the Internet, even if under home detention. Consequently, the Government asserts Mr. Reynoso poses a financial danger to the community that justifies continued detention.

Second, Government asserts that Mr. Reynoso poses a serious risk of flight such that his appearance in court could not be guaranteed without continued detention.

According to the Government, Mr. Reynoso has continually shown a lack of candor to the Government during its investigation and to the Probation Office in his pretrial services report. In the pretrial services report, he refused to disclose the amount of cryptocurrency he has access to. He also reported having only one bank account with the Bank of America, but he was arrested with a debit card from the Spanish Banco Bilbao Vizcaya Argentaria

("BBVA") and a debit card in someone else's name from the Panamanian bank Banesco. He has a Peruvian bank account and his company, ReyFer, has an account at the South Korean KEB Hana Bank. ReyFer is listed as Mr. Reynoso's source of employment in the pretrial services report, but he does not disclose his involvement in Thrive99X, despite his appearances on social media promoting it. As described above, ReyFer has been involved in a serious of suspect transactions involving Mr. Reynoso and various third parties that the Government characterizes as money laundering. Consequently, the Government argues that Mr. Reynoso has not provided a legitimate source of income and instead showed a lack of candor as to his source income and business activities in his pretrial services report. The Government is also concerned about the extensive liquid and potential undisclosed assets Mr. Reynoso holds. Mr. Reynoso has access to significant liquid assets, as between February 2021 and December 2023, more than $21.4 million was deposited into Mr. Reynoso's Binance account. The Government notes that Mr. Reynoso has noncustodial cryptocurrency wallets that only he has the private keys for, meaning that no government can access or evaluate any assets held in those wallets.

The Government next points to Mr. Reynoso's status as a dual national with extensive foreign travel and ties outside the United States. Mr. Reynoso previously listed his Florida property on the market; at least one real estate listing for the property states

"seller motivated." The only other property he holds equity in is a Peruvian house that he has 20 percent interest in. The remaining interest in the house is held by his family members in Peru. Mr. Reynoso holds a Peruvian passport and has family in Peru, including a sibling. Between 2020 and June 2025, he has taken sixty-eight trips to twenty-one unique destinations, some months spending more time outside the United States than within. Mr. Reynoso has also engaged with human smugglers to transport a girlfriend from the Bahamas into the United States.

The Government notes that there is an ongoing civil contempt proceeding against Mr. Reynoso in the District of Puerto Rico for his failure to comply with another District Court Judge's order issued March 4, 2025. (*See* Misc. Case No. 25-0068, Docket No. 20). Defendant was held in civil contempt for violating a warrant to seize property subject to forfeiture (the "Warrant") in the amount of 119.65 Bitcoin (BTC)[1] and was ordered to turn over the 119.65 BTC to the Government. Mr. Reynoso been fined $10,000.00 for each day he violates the seizure warrant after March 4, 2024; as of the *de novo* hearing, he owed more than $1.4 million in fines. Id. While the contempt ruling is on appeal, the Government argues that Mr. Reynoso's failure to comply with the order shows a lack of respect

---

[1] At the time the order in Misc. Case No. 25-0068 was issued, 119.65 BTC was worth approximately $12,650,785.94 USD. The Government and Defendant refer to 124 BTC at the *de novo* hearing, not 119.65 BTC. The Court proceeds using the 119.65 BTC figure, as was used by the District Judge in Misc. Case No. 25-0068.

for court rulings and indicates Mr. Reynoso may refuse to comply with future court orders.

The Government's argument is bolstered by Mr. Reynoso's conduct that resulted in the contempt ruling: the Warrant was served to Mr. Reynoso's lawyer during the afternoon of Friday, January 31, 2025, after the Government called the lawyer to see if he would accept service on behalf of Defendant. The lawyer claimed that he did not open the Warrant or give it to Mr. Reynoso until Sunday, February 2, 2025, but within two hours of the Warrant being served to his counsel, Mr. Reynoso transferred the 119.65 BTC subject to the Warrant to another Bitcoin wallet. (*See* Misc. Case No. 25-0068, Docket No. 20 at 6-8). Within twenty-four hours, Mr. Reynoso had moved the Bitcoin into five different wallets. Id. at 7. The Government argues this indicates Mr. Reynoso deliberately disregarded the Warrant by moving the subject assets out of the Government's reach. The Government moved to hold Mr. Reynoso in contempt on February 7, 2025, but Defendant did not move to quash the warrant until February 18, 2025— over two weeks after the Warrant was served and the Bitcoin dissipated. Id. At the *de novo* hearing, the Government stated that less than $2 million of Mr. Reynoso's Bitcoin has been recovered by the Government, leaving millions of dollars outstanding.

Third, considering the potential danger to the community and risk of flight posed by Defendant, the Government argues no

conditions of release could protect the community and ensure Mr.
Reynoso's appearance before the Court. Requiring Mr. Reynoso to
remain at his house and submit to electronic monitoring would not
stop him from continuing to engage in business ventures such as
Thrive99X, potentially harming customers and investors. The
Government —and other governments— lack the ability to control and
monitor cryptocurrency, making it difficult to know how many assets
Mr. Reynoso has and how he is interacting with them. This is shown
by the millions of dollars from OmegaPro investments that remain
hidden from the Government.

### B. Proffer by Defendant

Mr. Reynoso's counsel argued that no statutory presumption of
detention applies, Defendant does not pose a serious risk of flight
or danger to the community, and adequate conditions for his release
can be fashioned.

First, Mr. Reynoso disputed the Government's arguments that
he poses a flight risk, arguing he has strong ties to the United
States. He is fifty-seven years old and has lived in the United
States without a criminal record since he was twenty, virtually
the entirety of his adult life. His four children live in the
United States and are American citizens, as are his grandchildren.
Mr. Reynoso maintains close ties with these family members. While
he has travelled extensively for his job, he has always returned
to the United States. This was true even when he was aware that

the Government was investigating OmegaPro and that he was a target of that investigation; during that period, he entered the United States ten different times. While Mr. Reynoso does hold a Peruvian passport, he is willing to surrender it while on release. His previous refusals to disclose his cryptocurrency assets were made on the advice of his attorney and were not meant to show a lack of counsel to the Court.

Defendant notes that Mr. Reynoso's Florida property was taken off the market upon request of the Magistrate Judge in the Southern District of Florida, but at least some of the listings have remained up due to the sheer number of realtors interested in selling the property. The property had originally been purchased for Mr. Reynoso, his wife, and his two youngest daughters to live in; however, as the daughters ultimately remained in New Jersey, the house did not become a family home and Mr. Reynoso has been trying to sell it for some time. He is also willing to provide the house to the Court as collateral to demonstrate he will remain in the United States. The Peruvian house is a family home and only worth $300,000, so there is no indication Mr. Reynoso would flee Peru or otherwise rely on any Peruvian assets for support.

Mr. Reynoso notes that the contempt order against him is currently on appeal, and reiterated arguments made before the District Judge that held him in contempt. Namely, he argues that he was unaware of the Warrant when he moved the Bitcoin, the

Warrant was issued only after (and because) Bitcoins had started to move from the accounts, service of the Warrant was improper, there is no indication he has control over those assets, and his previous counsel that allegedly failed to timely check the contents of the Warrant has since been replaced with his current counsel. Mr. Reynoso questioned whether the Government's decision to seek continued detention was punitive due to the contempt ruling, and claimed that he was not the principal in this case, merely the least culpable of the four individuals involved in managing OmegaPro.

Defendant argues that his affiliation with human smugglers was a one-time relationship he used to bring a girlfriend into the United States (purportedly "the flavor of the month"). He is currently a witness in the prosecution of those smugglers and has not been indicted in that case. The different bank accounts and debit cards he possesses are for family members and a girlfriend in Panama, and the South Korean bank account has been closed for an "extensive period" of time.

Second, Mr. Reynoso argues that he does not pose a risk of danger to the community. Importantly, there is no evidence that Thrive99X is illegal or involved in any type of illegal activity. Mr. Reynoso's role in the company is similar to an inspirational speaker and as his social media ties him to Thrive99X, he is not trying to hide his business activity. His previous

acknowledgements that prior business ventures were Ponzi schemes are immaterial here as he was not a principal in these matters nor was he charged by the Government for his activities. Furthermore, Mr. Reynoso's activities with ReyFer were related to consulting activities he engages in and do not show he participated in money laundering.

Defendant also noted that the Court has previously expressed skepticism that the Government can prove "clear and convincing evidence of dangerousness" through proffer and has not found sufficient indica of dangerousness in previous cases through proffer. Mr. Reynoso's potential dangerousness was not brought up in proceedings in the Southern District of Florida and was not at issue until the instant *de novo* hearing.

Third, Defendant's daughter, Vivian Reynoso, appeared to speak on his behalf. Ms. Reynoso is a fulltime student who also works as a health and fitness coach and has obtained a degree of financial assistance from her father. She has one grandchild, and lives in New Jersey. She stated she is close with her siblings and that her family is very close due to her father, as her siblings share the same father, albeit different mothers. Ms. Reynoso is willing to sign any bond issued for Mr. Reynoso, cares for and trusts her father, and believes he would stay in the country if granted release. She was unsure what her father did for a living or how much time he spends out of the country.

Fourth, Defendant proposed various conditions of pretrial release. (Docket No. 42). His daughter and two other family members are willing to put up a $500,000 bond for him. He would surrender his American and Peruvian passports and submit his Florida residence as collateral. He would also be willing to submit to home detention, electronic monitoring, stop travelling, and refrain from participating in any sort of cryptocurrency business. Mr. Reynoso argued that the amount of money he can access should not be held against him for purposes of release.

### III. LEGAL STANDARD

#### A. Standard of review for a detention or release order

A district court reviews a magistrate judge's order of detention or release under a *de novo* standard and "need not defer to the magistrate judge's findings or give specific reasons for rejecting them." United States v. Cidraz-Santiago, 18 F.Supp. 3d 124, 126 (D.P.R. 2014) (citations omitted). A district court may "take additional evidence or conduct a new evidentiary hearing" when "the defendant has placed relevant facts at issue." Id.

#### B. The Bail Reform Act

Pursuant to the Bail Reform Act of 1984 (the "Act"), a judicial officer must determine whether a person charged with an offense shall be detained or released pending trial. *See* 18 U.S.C. § 3142(a). Section 3142(e) of the Act provides that if, after conducting a hearing, "the judicial officer finds that no condition

or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." Id. § 3142(e).

Section 3142(f) of the Act establishes the instances in which an accused individual is eligible for detention and therefore a detention hearing is proper. *See* 18 U.S.C. § 3142(f). Specifically, § 3142(f)(2)(A)-(B) authorizes the court to hold a detention hearing upon government motion or *sua sponte* in cases that involve "a serious risk that such person will flee" or "a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."

The standard of proof for detention due to dangerousness is clear and convincing evidence, while the standard of proof for detention due to risk of flight is preponderance of the evidence. Id.; *see* United States v. Patriarca, 948 F.2d 789, 793 (1st Cir. 1991); United States v. Berríos-Aquino, Crim. No. 22-473, 2022 WL 17075919, at *1 (D.P.R. Nov. 18, 2022). Clear and convincing evidence is "more than preponderance of the evidence but less than beyond a reasonable doubt." United States v. Acevedo-Ramos, 600 F.Supp. 501, 509 (D.P.R. 1984) (citations omitted), *aff'd*, 744 F.2d 203 (1st Cir. 1985) (Breyer, J.). This standard requires "a high degree of certainty that the information presented supports

the conclusion of dangerousness or risk to the obstruction of justice." Id.

To determine whether there are conditions of release that assure a defendant's appearance and the safety of the community, judicial officers must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's personal history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

## IV.  DISCUSSION

After considering the proffers of counsel, the arguments of the parties, and the transcript of the *de novo* detention hearing, the Court finds that the Government has proven by a preponderance of the evidence that no conditions of release could reasonably assure Defendant's appearance as required.

### A. The nature and circumstances of the offense charged

As stated above, Mr. Reynoso was charged with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). (Docket No. 3). Both counts carry a statutory maximum sentence of twenty years. *See* 18 U.S.C. §§ 1343, 1956(a). Both offenses are serious, particularly given the significant amount of money at stake: $650 million, over half a

billion dollars. A significant amount of these funds remains unrecovered, representing potentially devastating financial losses to middle class investors, pensioners, retirees, and public service employees. The severity of the offenses favors detention.

**B. The weight of the evidence against Defendant**

In addition to its *Motion* and proffer, the Government presented various Exhibits throughout the *de novo* hearing that related to the charged offenses and his more recent activities. The Government establishes a detailed summary of Mr. Reynoso's involvement in OmegaPro, describing numerous claims he made about OmegaPro to potential investors, the flow of investor funds to Mr. Reynoso's accounts, his lavish lifestyle while at OmegaPro, his participation in other defunct cryptocurrency enterprises (some of which he admits to be Ponzi schemes), the outstanding civil contempt order against him, and his evasiveness and refusal to answer or withhold information in response to various questions in his pretrial services report. (Docket No. 6 at 7-20). It is indisputable that Mr. Reynoso was involved in OmegaPro prior to its collapse, and Government's proffer and *Motion* ties Mr. Reynoso to the charged offenses. The Court concludes the weight of the evidence against Mr. Reynoso is strong and favors detention.

Regardless of the import or weight of the evidence proffered by the Government, the Court is not concerned with Mr. Reynoso's guilt or innocence at this time. *See* 18 U.S.C. §

3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence."). The Court's task is to assess whether there is a set of conditions that "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c).

### C. Defendant's personal history and characteristics

Relevant factors in assessing the risk of flight are that Defendant's residence, family and community ties, employment, financial resources, and past conduct. *See* 18 U.S.C. § 3142(c); United States v. Torres-Rosario, 600 F.Supp. 2d 327, 335 (D.P.R. 2009). Mr. Reynoso is a dual Peruvian-American citizen, holding passports from both countries. He has an extensive history of work-related foreign travel, such that his own children may not be aware when and for how long their father is out of the country. However, Mr. Reynoso has always returned to the United States and has made his home in United States for the past thirty-seven years. He owns one property in Miami, Florida, albeit a house that he has tried to sell in the past. He also holds a 20 percent interest in a family home in Peru, providing Defendant with a potential place to stay outside the United States.

The bulk of Mr. Reynoso's family have strong ties to the United States. Three of his children were born in the United States and all four children are American citizens, as were his grandchildren. His two youngest children are minors who have firmly

established lives in New Jersey, as does his wife, eldest daughter, and grandchild. Defendant's eldest daughter credits her father with bringing her family together and flew from New Jersey to Puerto Rico to speak on her father's behalf in person before the Court. Mr. Reynoso's son works with him in his businesses and, like his father, appears to travel extensively. Mr. Reynoso's family in Peru include his sisters, nephews, and nieces, some of whom he co-owns the house with and to whom he provides financial support. Although not family members, he has various girlfriends outside the United States who he provides financial support to and, in at least one case, sought to smuggle into the United States. As such, the Court concludes that while Mr. Reynoso retains strong family ties in the United States, he maintains a support network outside the country that could assist him in the event he left the United States. The Court also notes that Mr. Reynoso has not demonstrated any ties to his community beyond his immediate family members.

Mr. Reynoso is presently employed at ReyFer and Thrive99X, although the latter job was not disclosed in his pretrial services report. Both jobs appear able to be done remotely, and there is no indication that Mr. Reynoso has an office or formal workplace in the United States. To the contrary, his extensive overseas travel indicates he spend protracted periods of time out of the United States due to work commitments. Although Mr. Reynoso's involvement

in ThriveppX and ReyFer is not at issue in the instant case, the Government casts further doubt on the legitimacy of both enterprises, drawing parallels between Thrive99X and OmegaPro and using suspect ReyFer transactions to al, lege the company is simply a "money washing machine."

Mr. Reynoso has access to extensive liquid assets, although the Court is unable to determine the precise amount of funds he can reach. Although he declined to answer the Probation Office's questions about his cryptocurrency assets, Mr. Reynoso has access to multiple bank accounts in various countries, some of which he did not disclose in his pretrial services report. Although he reports a monthly income of $15,000 to $25,000, this does not align with his wealth and lifestyle advertised on social media. (Docket No. 6).  The Government claims that between February 2021 and December 2023, over $21.4 million in different cryptocurrencies were deposited in Mr. Reynoso's Binance account(s). Id. at 15. The Government also notes that "Mr. Reynoso extensively uses non-custodial wallets, in which the funds are globally accessible from any Internet connection" and "cannot readily be frozen or seized." Id. At a minimum, Mr. Reynoso has access to the 119.65 Bitcoin that were the subject assets to the Warrant and are valued at over $12 million. Defendant held multiple cryptocurrency cards at the time of his arrest, which allow users to go to "any ATM" and convert digital assets into local currency. Id. at 17. He was also

carrying the equivalent of more than $5,000 USD in American and Peruvian currencies. Id. The *Motion* and proffer further detail various cryptocurrency and wire transfers involving Mr. Reynoso and ReyFer that appear to lack a legitimate financial purpose and, at the very least, hint at an effort to conceal of the relevant funds. In short, Mr. Reynoso has sophisticated knowledge of various cryptocurrencies; the capability to rapidly transfer and access large amounts of money with minimal, if any, oversight; and a pattern of suspicious financial behavior.

Finally, the Court turns to Mr. Reynoso's past conduct, which is— in a word— concerning. Mr. Reynoso has accumulated over $1.4 million dollars in fines from a March 2025 contempt order issued by another District Judge after he failed to comply with the Warrant's order that he turn millions of dollars in Bitcoin over to the Government. While Defendant later sought to quash the Warrant and disputes both the timing of the transfer and whether Mr. Reynoso maintains control over the assets, the contempt order is still standing. The Government correctly notes that a party cannot choose to violate a court order instead of challenging it. Regardless of a party's motives or righteousness of his cause, "no man can be the judge in his own case." *See* Walker v. City of Birmingham, 388 U.S. 307, 321 (1967) (affirming a contempt conviction against petitioners who violated an injunction instead of challenging it). Furthermore, even assuming Mr. Reynoso's

attorney did err by failing to timely open and inform Mr. Reynoso of the Warrant, "as a general rule an attorney's blunder binds her client." Rosario-Diaz v. Gonzalez, 140 F.3d 312, 315 (1st Cir. 1998). In addition to the civil contempt order, Mr. Reynoso's responses to the pretrial services report are deficient, failing to disclose various bank accounts and his work at Thrive99X. He has been in contact with human smugglers to bring his girlfriend and a cousin into the United States illegally. (Docket No. 6 at 2). He has also failed to disclose the extent of his cryptocurrency assets, alluding to a Fifth Amendment issue. Viewing Mr. Reynoso's past conduct in its totality, the Court concludes Defendant has demonstrated a marked lack of candor and respect for Court orders. His personal history and characteristics are sufficient to show that he poses a serious risk of flight to justify detention.

The Court briefly reaches Defendant's argument that Mr. Reynoso's wealth should not be held against him and used to justify continued detention. He points to this Court's opinion in United States v. Ramos-Domínguez to argue that Mr. Reynoso's strong family ties justify release even if he has access to significant financial assets. See 698 F.Supp. 3d 224 (D.P.R. 2023). In Ramos-Domínguez, much like Mr. Reynoso, the Defendant had access "to vast wealth" from his father's business and his own drug trafficking, but strong family and business connections in Puerto Rico. Id. at 230. However, in that case, the Government's argument about the

defendant's foreign contacts was underdeveloped, some of the Defendant's wealth came from his family, and the Government had previously acknowledged that an electronic monitoring device could address concerns about the defendant's risk of flight. Id. This stands in sharp contrast to Mr. Reynoso's situation, where the extent of Defendant's foreign travel is dizzying and the Government has emphatically asserted that Mr. Reynoso poses a serious risk of flight such that detention is the only way to guarantee his appearance before the Court. Although Mr. Reynoso has strong family ties to the United States, the Government has sufficiently established that Defendant has foreign contacts and significant assets that render him at risk of flight. Continued detention is not justified only because of Mr. Reynoso's financial resources, but also because of his dual nationality status, history of international travel, family and property located outside the United States, previous conduct before the Court, and involvement with human smugglers.

### D. The nature and seriousness of the danger to any person or the community that would be posed by Defendant's release

There are no allegations or information indicating Mr. Reynoso poses a physical danger to any person or community. The Government asserts that Mr. Reynoso still poses a financial danger to others due to his pattern of past behavior in cryptocurrency schemes and current work with ReyFer and Thrive99X. Ultimately,

the Court does not find the Government's arguments to be sufficiently developed as to show Mr. Reynoso poses a danger to any person or the community through clear and convincing evidence. There is insufficient evidence to show Thrive99X is engaged in illegal activity or that Mr. Reynoso's work at Thrive99X or ReyFer threatens the financial security of others.

Furthermore, the Court reiterates its skepticism that 18 U.S.C. § 3142 entitles the Government to "establish dangerousness by clear and convincing evidence solely through a proffer" as the plain text of the Act "contains no language permitting prosecutors to proceed by proffer alone." Ramos-Domínguez, 698 F.Supp. 3d at 231. As the Government has not sufficiently established that Mr. Reynoso poses a danger to any person or community, this factor favors release.

## V. CONCLUSION

Defendant offers various conditions of supervised release to ensure his appearance before the Court. However, upon considering the four § 3142(g) factors when reviewing the parties' proffers, exhibits, and motions, the Court concludes that the Government has shown by a preponderance of the evidence that Mr. Reynoso poses a risk of flight such that no conditions proposed by the parties or weighed by the Court would be sufficient to reasonably assure Mr. Reynoso's appearance in future proceedings. *See* Patriarca, 948 F.2d at 793.

For the foregoing reasons, the Government's *Motion for Detention Pending Trial* at Docket No. 6 is **GRANTED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of July 2025.

s/Raúl M. Arias-Marxuach
UNITED STATES DISTRICT JUDGE